**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**MINT SOLAR, LLC**                                                    **PLAINTIFF**

**VS.**                               **NO. 5:19-cv-05167-TLB**

**SAM'S WEST, INC.**                                                    **DEFENDANT**

**BRIEF IN SUPPORT OF MOTION TO DISMISS**

This action concerns a Member Professional Services Agreement (the "Agreement")[1] between Sam's West, Inc. ("Sam's Club") and Mint Solar, LLC ("Mint"), a Utah company which, upon information and belief, is now defunct.  On September 28, 2017, Mint voluntarily entered the Agreement with Sam's Club following arm's-length negotiations.  Now, almost two years later, Mint claims that Sam's Club breached the Agreement and caused damages to Mint in the form of lost investments, business expenditures, and even $77 million in "forecasted net profits."  While Mint relies on the Agreement as the sole basis for its exorbitant damages claim, it has declined to offer a copy of the Agreement for the Court's consideration.[2]

Mint's decision to omit the Agreement from its filing is telling.  Even a cursory review of the Agreement's plain language reveals that Mint's alleged damages are not recoverable under Arkansas law.  And, because damages are an essential element of a breach-of-contract claim, the Agreement's contractual limitations require dismissal of the Complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The pending motion to dismiss should be granted.

---

[1] A copy of the Agreement is attached as exhibit 1 to Sam's Club's motion to dismiss.

[2] The Agreement is not the only piece of relevant information omitted from Mint's filing.  In the Complaint, Mint fails to acknowledge its failure to pay contractors and provide the solar products and services hundreds of Sam's Club's members purchased.  After Mint outright refused to address those problems for months (all in breach of the Agreement), Sam's Club incurred significant damages, including monies paid by Sam's Club directly to Mint's unpaid vendors in order to resolve and/or prevent liens from being filed against members' homes.

## I.     RELEVANT FACTS

Mint is (or was) a Utah limited liability company which billed itself as a "premier solar energy" provider.  Spencer Shumway, a Utah businessman, owns Mint and serves as its sole member.  Dkt. No. 2, ¶ 2.  Before the company literally fell apart, meaning before Mint became insolvent, before it lost its sales force who left to start a competing business, before it failed to make payments to its suppliers, which, at least in some cases, resulted in liens being placed on Sam's Club's members' property, and before its departing sales force had, among other things, allegedly misappropriated Mint's confidential and proprietary information, including information related to Sam's Club members, Mint was engaged in the business of providing products and services in the solar energy and home security spaces.  *Id.*, ¶¶ 7, 9.  In its Complaint, for example, Mint brags about the sophisticated "residential photovoltaic systems" and "automated residential home security systems" it sold to customers.  *Id.*

Sam's Club never sold its members Mint products or services.  Instead, the parties entered the Agreement,[3] pursuant to which Mint could "enter onto [certain] Sam's [Club] Location and solicit Sam's [Club] Members interested in purchasing Professional Services."  Ex. 1, § 2.2.  Mr. Shumway, who identified himself as Mint's "President," executed the Agreement on Mint's behalf.  Under the terms of the Agreement, if a Sam's Club member wished to purchase something, Mint agreed to contact that member "and offer to provide" the desired solar energy or home security services.  *Id.*, § 2.3.  Sam's Club had no direct involvement in the resulting transaction (if one took place) between Mint and the member, and the Agreement expressly provided that Sam's Club would "have no obligations or liabilities to any Participating [Sam's Club] Member, or to Mint, in connection with the Program, any Program Contract, the

---

[3] The Court may consider the Agreement in its decision on Sam's Club's motion to dismiss.  *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012).

Professional Services, or any other services provided (or to be provided) by Mint." *Id.*, § 2.4. Indeed, "[a]ny compensation due to Mint for the Services to be performed under each Program Contract [would] be the responsibility of the Participating [Sam's Club] Member." *Id.*, § 2.5. Sam's Club assumed no responsibility for the revenue generated by Mint through the sale of its products and services to Sam's Club members. *See id.* The arrangement, under the Agreement, was limited to Sam's Club granting access to its stores for Mint to "solicit" Sam's Club members "[b]y means of displays, brochures, and on-site representatives." *Id.*, § 2.2.

The Agreement, which defined the parties' respective rights and responsibilities, became effective on September 28, 2017. Dkt. No. 2, ¶ 10. Mint alleges that it began soliciting Sam's Club members at some point that same year. *Id.*, ¶ 13. According to the Complaint, Sam's Club required that Mint discontinue its in-store solicitation "because Sam's Club had not obtained necessary internal approvals." *Id.*, ¶ 14. Mint later re-entered Sam's Club locations after negotiating a partnership with AMP Security, LLC ("AMP") to provide certain home security services through a "ready-made sales force." *Id.*, ¶ 15. Around the same time, Mint allegedly developed a plan it calls the "dual intercept model" which, coupled with the AMP partnership, would have allowed for an aggressive expansion to 216 Sam's Club locations. *See id.*, ¶¶ 17–18. The Agreement does not address the expansion plan—which Mint describes as "the Rollout" in the Complaint—but Mint alleges that it "invested several hundred thousand dollars in preparing for" it. *Id.*, ¶ 19.

Problems then began to plague Mint's operations. In May 2018, a "former Mint sales representative" created a fifteen-minute video "entitled the 'Sam's Club Solar Scam.'" *Id.*, ¶ 21. The video, which sharply criticized Mint's business practices, was uploaded to the video-sharing platform YouTube. *Id.* That same month, "Mint learned that its chief sales officer, BJ Savage . .

. was orchestrating a plan to misappropriate Mint's sales opportunities with the [Sam's Club] Stores by taking Mint's sales leads and Mint's sales force." *Id.*, ¶ 22. Mint sued, *id.*, and Sam's Club was, understandably, concerned. *See id.*, ¶ 25. Mint alleges that Sam's Club representatives ordered that Mint "either resolve the issues immediately or . . . withdraw from all Stores." *Id.* Due to "the impossibility of immediately resolving [Sam's Club's] concerns, and in the hope of ameliorating the relationship . . . Mint withdrew from the Stores." *Id.*, ¶ 26. Mint argues that Sam's Club later wrongfully refused to allow it to re-enter. *Id.*, ¶ 28.

Mint filed this lawsuit on August 29, 2019. In the Complaint, Mint asserts only a single breach-of-contract claim against Sam's Club, which is based on Mint's belief that Sam's Club "materially breached the Agreement by, among other things, expelling Mint from the [Sam's Club] Stores on several occasions without providing the notice period required by the Agreement and by prohibiting Mint from re-entering the Stores." *Id.*, ¶ 36. Mint alleges that it "incurred damages, and continues to incur damages, plus on-going interest, attorneys' fees and costs." *Id.*, ¶ 37. Those "damages," however, are generally described in only two portions of the Complaint. First, Mint seemingly claims that it is entitled to its "invest[ment]" of "several hundred thousand dollars in preparing for the Rollout, including relocating some of AMP's sales management to oversee regions of [Sam's Club] Stores." *Id.*, ¶ 19. Second, Mint appears to seek damages in the amount of $77 million for "forecasted net profits through November 28, 2018," an amount of money Mint somehow thinks it would have made had it successfully completed "the Rollout" as planned. *Id.*, ¶ 32.

## II.    STANDARD OF REVIEW

Rule 12(b)(6) mandates dismissal of an action "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). This Court evaluates whether a complaint states

a cognizable legal claim through the lens of Rule 8(a), which requires that the complaint contain a "'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The law "'demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

"[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A complaint that "pleads facts that are merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." *Id.* Moreover, although the Court accepts as true well-pleaded facts, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"Though matters outside the pleading may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Ashanti*, 666 F.3d at 1151 (quoting *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004)). "[T]he contracts upon which [a] claim rests . . . are evidently embraced by the pleadings." *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n. 4 (8th Cir. 2003).

### III.   ARGUMENT

Arkansas law applies in this diversity action. *Northport Health Servs. of Arkansas, LLC v. Press*, No. 5:14-CV-05074, 2015 WL 11120887, at *3 (W.D. Ark. June 15, 2015). Under

5

Arkansas law, in order to state a cause of action for breach of contract, the complaint must allege the existence of an enforceable contract between the plaintiff and defendant, the obligation of the defendant thereunder, a violation by the defendant, and damages resulting to the plaintiff from the breach. *Smith v. Eisen*, 97 Ark. App. 130, 139, 245 S.W.3d 160, 168-69 (2006). While there is no dispute that the Agreement represents a valid and binding contract (entered into voluntarily by two sophisticated actors), Mint has failed to state a breach-of-contract claim because it has not alleged to have incurred any recoverable damages.

Damages, of course, "are an essential element of a breach-of-contract claim." *Brookewood, Ltd. P'ship v. DeQueen Physical Therapy & Occupational Therapy, Inc.*, 2018 Ark. App. 204, at 9, 547 S.W.3d 461, 467. As such, "there must be an allegation of sufficient facts to satisfy the damage element or the case is subject to a motion to dismiss." *Wallis v. Ford Motor Co.*, 362 Ark. 317, 319, 208 S.W.3d 153, 155 (2005). Here, the Complaint identifies only three forms of potential damage caused by Sam's Club's alleged breach of the Agreement: (1) "forecasted net profits" which "exceed $77 million"; (2) an "invest[ment]" by Mint of "several hundred thousand dollars in preparing for the Rollout"; and (3) "interest, attorneys' fees and costs." *See* Dkt. No. 2, ¶¶ 19, 32, 37. The Agreement, however, includes various limitation provisions barring the recovery of each of those forms of damage. As a result, Mint has failed to allege even a plausible claim for breach of contract, and the Complaint is subject to dismissal with prejudice under Rule 12(b)(6).

## A.    Mint cannot recover lost profits

In paragraph 32 of the Complaint, Mint makes a passing reference to the damages it hopes will shape this litigation. There, Mint claims that "[b]ased on the Rollout and its previous sales history, Mint's forecasted net profits through November 28, 2018 exceed $77 million." *Id.*,

6

¶ 32. Mint cannot recover lost profits because it agreed that such damages were not recoverable in the Agreement. And, even if such damages were not contractually barred, the Complaint fails to allege that Sam's Club tacitly assumed responsibility for Mint's consequential losses.

### 1.    Section 5.3 of the Agreement precludes a recovery of lost profits

Mint forfeited its right to recover the lost profits sought in the Complaint on September 28, 2017, the day its President, Mr. Shumway, voluntarily entered the Agreement on Mint's behalf. Under Arkansas law, "[p]arties to a contract are free to contract upon any terms not contrary to public policy or the terms of our statutes." *Pest Mgmt., Inc. v. Langer*, 369 Ark. 52, 60, 250 S.W.3d 550, 556 (2007). Parties can—and often do—agree to contractual terms which set forth the remedies available in the event of an alleged breach. *Conway Commercial Warehousing, LLC v. FedEx Freight E., Inc.*, 2011 Ark. App. 51, at 7, 381 S.W.3d 94, 99.

In the present case, the parties stipulated as to the unavailability of lost profits in the event of a breach. That agreement is set forth in section 5.3 of the Agreement:

5.3    **Limitation of Liability.**

**(A)    IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY PUNITIVE, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING, BUT NOT LIMITED TO LOST PROFITS, BUSINESS REVENUES, BUSINESS INTERRUPTION AND THE LIKE), ARISING FROM OR RELATING TO (i) THE RELATIONSHIP BETWEEN MINT AND SAM'S CLUB, INCLUDING ALL PRIOR DEALINGS AND AGREEMENTS, (ii) THE CONDUCT OF BUSINESS UNDER THIS AGREEMENT, (iii) BREACH OF THIS AGREEMENT, OR (iv) TERMINATION OF BUSINESS RELATIONS BETWEEN THE PARTIES, AND REGARDLESS OF WHETHER THE CLAIM UNDER WHICH SUCH DAMAGES ARE SOUGHT IS BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY, STATUTE, REGULATION, OR ANY OTHER LEGAL THEORY OR LAW, EVEN IF SAM'S CLUB OR MINT HAS BEEN ADVISED BY THE OTHER PARTY OF THE POSSIBILITY OF SUCH DAMAGES.**

Ex. 1, § 5.3(A). Such limitation-of-liability provisions are unambiguous, *see Erdman Co. v. Phoenix Land & Acquisition, LLC*, No. 2:10-CV-2045, 2013 WL 3776405, at \*2 (W.D. Ark. July 17, 2013) (applying Arkansas law), so the Court should give effect to the plain and ordinary meaning of the provision as intended by the parties. *Pittman v. Pittman*, 84 Ark. App. 293, 298, 139 S.W.3d 134, 136 (2003). "The intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement." *Rausch Coleman Homes, LLC v. Brech*, 2009 Ark. App. 225, at 5, 303 S.W.3d 456, 458. As such, "[t]he best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may safely be assumed that such was the aspect in which the parties themselves viewed it." *Id.* at 5, 303 S.W.3d at 458-59.

The sweeping limitation provision set forth in section 5.3 expressly prohibits Mint from recovering "lost profits" or "business revenues" as a result of any alleged "breach of th[e] Agreement." Ex. 1, § 5.3(A). That contractual restriction on available damages applies "regardless of whether the claim under which such damages are sought is based upon breach of . . . contract . . . even if . . . Mint has been advised by [Sam's Club] of the possibility of such damages." *Id.* As the Arkansas Court of Appeals has found, "[t]he parties here agreed on a remedy in the event of a breach, and we see no reason why they should not be bound to it." *Conway Commercial Warehousing, LLC*, 2011 Ark. App. 51, at 7, 381 S.W.3d at 99. Because Mint cannot recover lost profits under the Agreement, the Complaint fails to state a claim.

> **2. Alternatively, Mint has failed to plead that Sam's Club tacitly agreed to assume responsibility for lost profits**

Even if a court were to entertain an argument that the plain language of section 5.3 does not automatically preclude the recovery of lost profits, Mint's theory still fails. "Consequential damages are those damages that do not flow directly and immediately from the breach, but only

8

from some of the consequences or results of the breach." *K.C. Properties of N.W. Arkansas, Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 24, 280 S.W.3d 1, 10 (2008). "Lost profits are well recognized as a type of consequential damages." *Smith v. Walt Bennett Ford, Inc.*, 314 Ark. 591, 605, 864 S.W.2d 817, 825 (1993). As such, Arkansas's "tacit agreement" rule applies, pursuant to which "the plaintiff must prove more than the defendant's mere knowledge that a breach of the contract will entail special damages to the plaintiff; it must also appear that the defendant at least tacitly agreed to assume responsibility for such damages." *Hobson v. Entergy Arkansas, Inc.*, 2014 Ark. App. 101, at 13, 432 S.W.3d 117, 126. The defendant must not only have knowledge of the special circumstances, but

> such knowledge "must be brought home to the party sought to be charged under such circumstances that he must know that the person he contracts with reasonably believes that he accepts the contract with the special condition attached to it." In other words, where there is no express contract to pay such special damages, the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part.

*Reynolds Health Care Servs., Inc. v. HMNH, Inc.*, 364 Ark. 168, 177, 217 S.W.3d 797, 805 (2005) (quoting *C.D. Smith Motor Co.*, 353 Ark. 228, 241, 106 S.W.3d 425, 431-32 (2003) (citations omitted)).

The plain language of the Agreement unequivocally demonstrates that Sam's Club did not agree to assume responsibility for any lost profits allegedly incurred by Mint. First, the parties expressly disclaimed any potential liability for lost profits, "even if Sam's Club . . . ha[d] been advised . . . of the possibility of such damages." Ex. 1, § 5.3. More important, however, are the Agreement's other provisions, which also require consideration. *Rausch Coleman Homes, LLC*, 2009 Ark. App. 225, at 5, 303 S.W.3d at 458; *see also Deck House, Inc. v. Link*, 98 Ark. App. 17, 25, 249 S.W.3d 817, 825 (2007) ("[I]n the absence of such an express contract to

9

pay such special damages, the facts and circumstances in proof must be such as to make it reasonable for the judge or jury trying the case to believe that the party at the time of the contract tacitly consented to be bound to more than ordinary damages in case of default on his part."). Though Mint frames its allegations in such a way as to suggest that Sam's Club was selling Mint's products and services, the Agreement demonstrates otherwise. The parties' arrangement simply gave Mint "the right to enter onto the Specified Sam's [Club] Locations and *solicit* Sam's [Club] Members interested in purchasing Professional Services." Ex. 1, § 2.2 (emphasis added). If a member was interested, Mint agreed to then "*contact the interested Sam's [Club] Member . . . and offer to provide to any such . . . Member who meets Mint's eligibility requirements the products and services*" sold by Mint. *Id.*, § 2.3. Sam's Club had no involvement in the actual transaction which forms the basis for Mint's outlandish "forecasted net profits" calculation. And, in fact, Sam's Club so stated in the Agreement:

> Sam's [Club] and its affiliates shall have no obligations or liabilities to any Participating Member, or to Mint, in connection with the Program, any Program Contract, the Professional Services, or any other services provided (or to be provided) by Mint to a Participating Member outside the scope of the Services. Mint shall clearly and conspicuously disclose to the Member that the Program Contract is between Mint and the Member only, and that Mint or its Affiliate, as the case may be, is an independent business that is not owned by or affiliated with Sam's [Club].

*Id.*, § 2.4. A fair reading of section 5.2 of the Agreement alongside sections 2.2, 2.3, and 2.4 leads to only one result—Sam's Club did not tacitly assume potential liability for the lost profits sought in the Complaint. Arkansas law bars those damages, and, as a result, the Complaint fails to state a claim for breach of contract.

10

**B.     Mint cannot recover expenditures, investments, or commitments made in reliance upon the Agreement**

Mint's unrecoverable damages do not end with lost profits.  In the Complaint, Mint seemingly seeks to recoup alleged expectancies—and even expenditures, investments, or commitments made to third parties—as a result of its deal with Sam's Club.  Mint, for example, makes a number of references to the anticipated success of "the Rollout."  *See, e.g.*, Dkt. No. 2, ¶ 18 ("Based on the success of the Dual Intercept Model, Mint, under Sam's Club's direction, planned to immediately expand the Dual Intercept Model into the 64 Stores where Mint was already selling Solar Services, and thereafter expand into 216 Stores . . . .").  Further, Mint seemingly claims it is entitled to expenditures made to facilitate "the Rollout," including an "invest[ment]" of "several hundred thousand dollars" "[i]n reliance on the Agreement."  *Id.*, ¶ 19.

Section 9.17 of the Agreement prevents Mint from obtaining this second form of damages.  The contract reads,

> **9.17   No Business Guarantee; No Reliance on Oral Representations or Promises.**  Except as otherwise agreed between the Parties, Sam's Club has no obligation to provide any minimum amount of business to Mint, and no person has authority to make any representations or promises of business to Mint on Sam's Club's behalf or about Sam's Club's intentions or expectations of renewing or extending this Agreement or providing any present or future business to Mint, except as may be contained in writing and signed by an officer of Sam's Club. Any expenditures, investments, or commitments made by Mint in reliance on any present or future business from Sam's Club pursuant to this Agreement are done at Mint's own risk and without any obligation whatsoever from Sam's Club.  Mint shall perform the Services for Sam's Club on a non-exclusive basis, and nothing in this Agreement will limit Sam's Club's right to contract with other providers, or develop or acquire materials or programs that are similar to or competitive with the Services.

Ex. 1, § 9.17.  Such a limitation provision is valid between Sam's Club and Mint, *see Conway Commercial Warehousing, LLC*, 2011 Ark. App. 51, at 7, 381 S.W.3d at 99, and Arkansas law

requires that the Court "enforce the contract that they have made*." DaimlerChrysler Corp. v. Smelser*, 375 Ark. 216, 219, 289 S.W.3d 466, 470 (2008). While the Complaint seeks damages for the business expectancies associated with "the Rollout" and the "several hundred thousand dollars" invested "[i]n reliance on the Agreement," section 9.17 plainly precludes Mint's ability to pursue those damages. "Sam's Club ha[d] no obligation to provide any minimum amount of business to Mint." Ex. 1, § 9.17. Further, Mint has not alleged that its expectancies arise from representations made "in writing and signed by an officer of Sam's Club." *Id.* And, most importantly, according to the Agreement, "[a]ny expenditures, investments, or commitments made by Mint in reliance on any present or future business from Sam's Club pursuant to th[e] Agreement [were] done at Mint's own risk and without any obligation whatsoever from Sam's Club." *Id.* Consequently, the Complaint fails to state a breach-of-contract claim absent allegations of recoverable damages on the part of Mint.

**C.      Mint cannot recover attorneys' fees, costs, and interest**

The Complaint also includes a demand for attorneys' fees, costs, and interest. *See* Dkt. No. 2, ¶ 37; *see also id.* at "PRAYER FOR RELIEF" (requesting "attorneys' fees, and costs"). Those damages, too, are barred by the Agreement.

Under Arkansas law, a contract provision concerning an award of attorneys' fees is enforceable "in accordance with its terms." *Griffin v. First Nat. Bank of Crossett*, 318 Ark. 848, 856, 888 S.W.2d 306, 311 (1994); *see also Marx Real Estate Investments, LLC v. Coloso*, 2011 Ark. App. 426, at 14, 384 S.W.3d 595, 603 ("Th[e] agreement was enforceable according to its terms independent of the statutory authorization for attorney's fees set forth in section 16-22-308."). Mint consented to such a provision in the Agreement:

> 5.2      **Suits; Expenses and Attorneys' Fees.**  If a Party is successful in recovering a claim against the other in a court of law or arbitration proceeding,

> *the recovering Party will not be entitled to recover all of its expenses incurred in collecting its claim, including reasonable attorneys' fees, costs and interest* from the date of delivery or scheduled delivery of the shipment.

Ex. 1, § 5.2 (emphasis added).  Since the Court must enforce section 5.2 of the Agreement "in accordance with its terms," *Griffin*, 318 Ark. at 856, 888 S.W.2d at 311, Mint's claim for attorneys' fees, costs, and interest is subject to dismissal under Rule 12(b)(6).[4]

## V.     CONCLUSION

For the reasons set forth above, the Court should grant Sam's Club's motion to dismiss and dismiss the Complaint with prejudice.

This 4th day of October, 2019.

> Karen P. Freeman (Ark. Bar No. 2009094)
> **MITCHELL, WILLIAMS, SELIG**
> **GATES & WOODYARD, P.L.L.C.**
> 4206 South J.B. Hunt Drive, Suite 200
> Rogers, Arkansas  72758
> (479) 464-5650
> kfreeman@mwlaw.com
>
> **- AND -**
>
> Graham Talley (Ark. Bar No. 2015159)
> **MITCHELL, WILLIAMS, SELIG**
> **GATES & WOODYARD, P.L.L.C.**
> 425 West Capitol Avenue, Suite 1800
> Little Rock, Arkansas  72201
> (501) 688-8800
> gtalley@mwlaw.com
>
> *Counsel for Defendant Sam's West, Inc.*

---

[4] Application of the Arkansas statute authorizing an award of attorneys' fees to the prevailing party leads to the same result.  That law allows a prevailing party to recover a "reasonable attorney's fee," "unless otherwise provided by law *or the contract which is the subject matter of the action*."  Ark. Code Ann. § 16-22-308 (emphasis added). Here, the parties agreed to a contractual prohibition which reaches Mint's request for attorneys' fees, costs, and interest. Ex. 1, § 5.2.