**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

MINT SOLAR, LLC                                              **PLAINTIFF/**
                                                   **COUNTER-DEFENDANT**


V.                         **CASE NO. 5:19-CV-05167**

SAM'S WEST, INC.                                        **DEFENDANT/**
                                                   **COUNTER-CLAIMANT**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Before the Court are cross-motions for summary judgment filed by Plaintiff Mint Solar, LLC and Defendant Sam's West, Inc. ("Sam's Club"). Sam's Club filed a Motion for Summary Judgment, a Memorandum Brief in Support, and a Statement of Undisputed Facts. Mint filed a Response in Opposition to the Motion and a Statement of Material Facts, and Sam's Club filed a Reply. Mint also filed a Motion for Partial Summary Judgment accompanied by a Brief in Support. Sam's Club filed a Response in Opposition and a Response to Mint's Statement of Material Facts. Mint filed a Reply.[1] For the reasons explained below, Sam's Club's Motion (Doc. 63) is **GRANTED IN PART AND DENIED IN PART**, and Mint's Motion (Doc. 60) is **DENIED**.

## I.  BACKGROUND

### A.  Factual and Procedural Background

Plaintiff Mint Solar is a Utah-based limited liability company owned by Spencer Shumway. In September 2017, Mint entered into a Member Professional Services

---

[1] In compliance with the Protective Order entered in this case, where a filing contained confidential information, redacted copies were filed to the public docket and unredacted copies were filed under seal. In ruling on these cross-motions for summary judgment, the Court has considered the materials found at Docs. 60, 61, 63–67, 70, 71, 76–83, 90, 91, 100, and 101.

Agreement (the "Agreement") with Sam's Club.  Pursuant to the Agreement, Mint sold residential solar panels and home security systems to Sam's Club members in select clubs.  The installation of solar panels sold by Mint involved a second company, Knight West Construction, which was run by Spencer's father, Scott Shumway.  When Mint finalized a contract for a solar energy system, it ordered the parts needed from SamsClub.com, and Sam's Club purchased the equipment from Knight West.  Mint purchased the labor for installation in the same manner.  Sam's Club earned revenue through a markup on this passthrough.

The Agreement between Mint and Sam's Club contemplated that Mint would offer both solar panels and home security systems in 216 Sam's Club locations.  In May 2018, Mint was operating in 64 clubs.  Mint asserts that it made investments to be able to expand into all 216 clubs during the summer and fall of 2018, which it refers to as the "Rollout." As of June 29, 2018, however, Sam's Club no longer permitted Mint to offer its services in Sam's Clubs.  On August 30, 2018, counsel for Sam's Club sent Mint a letter "intended to serve as written confirmation that the Agreement is terminated" based on Sam's Club's determination that "it is abundantly clear that Mint is and has been in material breach of the Agreement and that it is unable to cure its breaches."  (Doc. 77-3, p. 5).

Approximately one year later, Mint filed its claim for breach of contract, alleging that Sam's Club violated the termination clause of the Agreement by failing to provide notice before removing Mint from its clubs.  Mint seeks as damages the profits it estimates it would have earned had it been able to continue providing services and expanding during the notice period required by the Agreement, the expenditures it made in preparation for the Rollout, and attorney's fees and costs.  Sam's Club filed a motion to dismiss, which

the Court denied in a Memorandum Opinion and Order entered on November 22, 2019 ("November 22 Opinion").  Then Sam's Club filed a counterclaim for breach of contract, alleging that it incurred damages as a result of Mint's prior material breaches.  Sam's Club asserts that it paid installers to complete work begun on members' houses, provided members with rebates and gift cards promised by Mint, and gave some members free membership renewals.  Now Sam's Club has filed a Motion for Summary Judgment as to Mint's breach of contract claim.   Mint has also filed a Motion for Partial Summary Judgment as to liability on its claim for breach of contract and as to Sam's Club's counterclaim.  Below, the Court takes up each Motion in turn.

## B.  Relevant Contract Language

Several provisions of the Agreement are relevant to the parties' dispute and are provided below.

### 1.  Termination

The Agreement provides for a one-year term that "automatically renew[s] for successive 90 day [sic] terms" unless terminated.  (Doc. 66-1, p. 1, ¶ 1.2).  The Agreement provides three avenues for termination:

> A. Either Party may terminate this Agreement at any time, with or without cause, upon ninety (90) days' written notice of said termination to the non-terminating Party.

> B. Either Party may terminate this Agreement upon the other Party's failure to cure a material breach or default, as defined herein, within thirty (30) days of receiving written notice of the same (the "Cure Period"). The Cure Period shall begin to run on the day notice is provided to the Party in breach or default consistent with the terms and conditions of this Agreement governing notice, identifying the deficiency complained of and relief sought. If the material default is not cured within the Cure Period, the non-breaching party may give notice of termination to the other Party, such termination being effective thirty (30) days from such notice (the "Transition Period").

During the Transition Period, the Parties agree to cooperate in good faith in transferring the services provided herein to another provider.

C. Either Party may terminate this Agreement at the end of any Term by providing the other Party with written notice of termination within 30 days' [sic] prior to the end of the Term.

*Id*. at p. 2, ¶ 1.3.  The Court refers to subsection B as the "notice-and-cure" provision.

### 2.  Breach

In the next section, the Agreement lists events that "shall constitute a default and breach":

A.  The non-payment of any compensation, charges, costs, debts, expenses or other obligations accruing and owed under the Agreement;

B.   The voluntary or involuntary bankruptcy, receivership, insolvency or garnishment of a Party;

C.   Failure to comply with any statement of work, level of service or any other terms or conditions contained within any Schedule attached hereto; or

D.  The breach of any provision of this Agreement.

*Id.* at p. 2, ¶ 1.4.

### 3.  Performance Standards

The Agreement requires that "Mint will perform the services in a professional, efficient and workmanlike manner in accordance with standard industry practice."  *Id.* at p. 4, ¶ 2.7.

### 4.  Confidentiality

The Agreement defines "confidential information" to include "information obtained by either party relating to the other party's past, present and future operation and business activities, including without limitation the name of Sam's Club Members [and] vendors." *Id.* at p. 7, ¶ 8.1.  The Agreement further provides that "Mint and Sam's Club shall hold all such Confidential Information in confidence and will not use such information other

than for the benefit of the other party.  A Party will not disclose such Confidential Information to any other third party . . . ." *Id.*

## 5. Damages

The Agreement contains two relevant provisions that limit the damages available in the event of a breach.  First, the Limitation of Liability reads as follows:

> (A) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY PUNITIVE, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING, BUT NOT LIMITED TO LOST PROFITS, BUSINESS REVENUES, BUSINESS INTERRUPTION AND THE LIKE), ARISING FROM OR RELATING TO (i) THE RELATIONSHIP BETWEEN MINT AND SAM'S CLUB, INCLUDING ALL PRIOR DEALINGS AND AGREEMENTS, (ii) THE CONDUCT OF BUSINESS UNDER THIS AGREEMENT, (iii) BREACH OF THIS AGREEMENT, OR (iv) TERMINATION OF BUSINESS RELATIONS BETWEEN THE PARTIES, AND REGARDLESS OF WHETHER THE CLAIM UNDER WHICH SUCH DAMAGES ARE SOUGHT IS BASED UPON BREACH OF WARRANTY, BREACH OF CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY, STATUTE, REGULATION, OR ANY OTHER LEGAL THEORY OR LAW, EVEN IF SAM'S CLUB OR MINT HAS BEEN ADVISED BY THE OTHER PARTY OF THE POSSIBILITY OF SUCH DAMAGES.

*Id.* at p. 6, ¶ 5.3(A).

Additionally, the Agreement provides:

> Except as otherwise agreed between the Parties, Sam's Club has no obligation to provide any minimum amount of business to Mint, and no person has authority to make any representations or promises of business to Mint on Sam's Club's behalf or about Sam's Club's intentions or expectations of renewing or extending this Agreement or providing any present or future business to Mint, except as may be contained in writing and signed by an officer of Sam's Club. Any expenditures, investments, or commitments made by Mint in reliance on any present or future business from Sam's Club pursuant to this Agreement are done at Mint's own risk and without any obligation whatsoever from Sam's Club.

*Id.* at p. 13, ¶ 9.17.

### 6.  Attorney's Fees and Costs

Regarding costs and attorney's fees, the Agreement states:

> If a Party is successful in recovering a claim against the other in a court of law or arbitration proceeding, the recovering Party will not be entitled to recover all of its expenses incurred in collecting its claim, including reasonable attorneys' fees, costs and interest from the date of delivery or scheduled delivery of the shipment.

*Id*. at p. 6, ¶ 5.2.

## II.  LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts.  *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997).  The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)).  However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment.  *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Rather, in order for there to

be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### III.  SAM'S CLUB'S MOTION FOR SUMMARY JUDGMENT

The Court first takes up Sam's Club's Motion for Summary Judgment.  Sam's Club argues that prior to June 29, 2018—when Mint was removed from the clubs without written notice—Mint materially breached the Agreement in three ways.  First, Mint was insolvent as of April 30, 2018, in breach of Section 1.4(A).  Second, by failing to staff its tables inside Sam's Clubs; owing money to customers, employees, and installers; and failing to complete member projects, Mint breached Section 2.7 of the Agreement requiring that Mint conduct its operations in a professional and workmanlike manner. Finally, Mint breached the confidentiality requirement contained at Section 8.1 when a Mint executive, BJ Savage, conspired with Knight West employees to divert leads from Mint gathered in Sam's Clubs.  Sam's Club argues that these material breaches released it from the obligation to perform under the Agreement, including the notice-and-cure requirement.  In the alternative, Sam's Club argues that it was not required to give Mint notice and an opportunity to cure because the breaches were incurable.

As laid out below, the Court finds that there is no genuine dispute that Mint was in material breach of the Agreement before June 29, 2018.  However, the Agreement reflects the parties' commitment that a breaching party would have thirty days to remedy a breach.  Therefore, the mere fact of Mint's breach does not excuse Sam's Club's failure to provide Mint written notice and an opportunity to cure.  An opportunity to cure is not

required, however, where it would be futile.  Disputes of fact in the record preclude the Court from deciding the issue of futility at summary judgment, so Sam's Club will be permitted to present this defense to the jury during trial.

If it does not prevail as to liability, Sam's Club asks the Court to hold as a matter of law that, under the Agreement, Mint may not seek as damages certain lost profits, reliance damages, and attorney's fees.  The Court agrees that lost profits calculated based on Mint's potential expansion into additional Sam's Clubs and costs incurred in preparation for that expansion are precluded by the language of the contract, as are attorney's fees and costs.

## A.  Mint Committed Material Breaches of the Agreement

### 1. Insolvency

Sam's Club first asserts that Mint was insolvent by April 30, 2018.[2]  In making this assertion, Sam's Club relies on Mint's balance sheet as of April 30, 2018, and a record of profit and loss between January and April 2018, which were provided by Mint on June 28, 2018.  *See* Doc. 66-16.  Each of these documents reflects a negative net income.  More specifically, "Work in Process" is valued at $371,309 in the balance sheet, but the sum of

---

[2] The Agreement lists insolvency as a type of breach but does not define the term.  Sam's Club points out that in the context of the Uniform Voidable Transactions Act, the state legislature defines insolvent as "the sum of the debtor's debts [being] greater than the sum of the debtor's assets."  Ark. Code Ann. § 4-59-202(a).  The statute also provides that a "debtor that is generally not paying the debtor's debts as they become due . . . is presumed to be insolvent."  Ark. Code Ann. § 4-59-202(b).  This is consistent with the definition affirmed by the Arkansas Supreme Court in *Rex Buggy Co. v. Ross*— "insolvency is a general inability of a [party] to pay his indebtedness in the ordinary course of business . . . ."  97 S.W. 291, 292 (Ark. 1906).  Mint's expert, Richard Hoffman, also acknowledged these two definitions to be "consistent" with the ways he has seen the term defined.  (Doc. 66-5, p. 3, depo. 134:4–12).  Ultimately, the Court concludes that there is no genuine dispute that Mint was insolvent under either definition.

the entries for accounts payable, accrued payroll expense, promotional incentives, and accrued Sam's gift cards alone exceeds this amount.[3]  *See id.* at p. 3.  Additionally, the following day, Amanda Love received an email from Doug Robinson at LGCY Power proposing terms for an agreement between LGCY and Sam's Club.  *See* Doc. 66-17.  In that email, Doug notes that "Mint has a WIP (work in progress) in place with Sam's Club customers.  The sub contractors are unwilling to complete the work due to lack of payment.  The cost of this is ~$300K to get them paid and get the work moving forward." (Doc. 66-17, p. 2).  The email also notes that "Mint has outstanding customer incentives of ~$375K."  *Id.*

Other emails revealed to Sam's Club in the course of discovery support Sam's Club's initial conclusion upon review of the financial documents provided by Mint in June. For example, in an email dated May 14, 2018, Scott contacted a potential investor, Emporia Energy, and stated,

> I have discovered that our financial position is even more urgent than I thought.  I was assuming that we would be putting off some installers and a few other non-essential bills, but it turns out that we are not able to pay commissions due, and we will have both salesman [sic] and sales managers quit if we can't figure out a way to get them taken care of. . . .  We will need $250,000-$300,000 to take us through the next 5 or 6 weeks.

(Doc. 91-4, p. 2).  On June 1, 2018, Sunlight Financial notified Scott at his mintsolar.com email address that "effective immediately, no further advances will be made by Sunlight

---

[3] The Court notes that the balance sheet also contains a liability entry for "accrued utility rebates" for $74,717.  *See id.* at p. 3.  In his deposition, Spencer asserted that while Mint would assist customers in seeking these utility rebates, they were paid by the utility company to the customer and did not come from Mint.  *See* Doc. 81-5, p. 37, depo. 140:3–10.  If this is true, it is perplexing that accrued utility rebates appear under Mint's liabilities. Nevertheless, the Court has excluded rebates from consideration in evaluating the evidence as to insolvency.

at Initial Approval of any Loan" because of "substantial concerns about Knight West's current financial condition." (Doc. 66-12). Finally, the record is full of correspondence from employees, customers, and installers indicating that Mint was not fulfilling its financial obligations. *See, e.g.*, Doc. 66-9 (demand letter from attorney representing former Mint market manager who claims to be owed more than $30,000 in wages); Doc. 66-10, p. 2 (email from installer claiming to be owed almost $40,000 and indicating he will begin to seek contractor liens on customers' homes); Doc. 66-11, p.1 (internal email indicating that Mint owed at least $280,000 to Sam's Club members);[4] *id*. at p. 2 (email from employee threatening to file a complaint with Arizona Department of Labor if wages are not received by May 15); *id.* at p. 3 (text message from employee seeking late wages owed to himself and another); Doc. 66-21 (demand letter on behalf of installer in Texas owed at least $89,000 stating that customers are awaiting installations, but work cannot be completed because installer has not been paid); Doc. 70-4, p. 24 (customer complaint regarding unpaid gift cards and rebates); *id.* at p. 26 (customer complaint that Mint promised approximately $10,000 in rebates but customer cannot reach anyone at the company and an internet search suggests that Mint is permanently closed); *id.* at p. 34 (complaint from customer owed $1,912 in promotional incentives and who received no response from Mint); Doc. 77-16 (notification from the North Carolina Department of Labor of an employee complaint for unpaid wages); Doc. 77-17 (Mint internal email reporting two staff leaving work because they had not been paid); Doc. 77-18 (email from employee regarding late paycheck and indicating that of three paychecks she received,

---

[4] This email also indicates that there are "outstanding" utility rebates in the amount of $200,000–$400,000. However, as noted above, *supra* n.3, the Court does not factor this in as an amount owing by Mint.

two have been late); Doc. 77-19 (second email by an employee seeking payment for wages owed); Doc. 77-25 (invoice for audio/video services 85 days past due).

Given this evidence, the burden shifts to Mint to bring forward specific facts that create a genuine dispute of fact as to Mint's financial condition.  Mint points to the deposition testimony of Spencer and Scott Shumway.  When Spencer was asked, "Was Mint Solar at any point insolvent in its relationship with Sam's Club?" he responded, "Absolutely not." (Doc. 81-5, p. 26, depo. 96:7–9).  Scott asserted several times in his deposition that Mint could have fulfilled its financial obligations if it had been permitted to complete its work in progress ("WIP"), which it could have accomplished without additional investment from third parties:

> [I]f you look at the numbers, finishing the WIP would have provided us with all the money and money left over to take care of any bills, any installers, any salespeople. All of that would have been taken care of.

(Doc. 81-6, p. 44, depo. 170:20–24).

> As far as being able to complete and pay for the installations, pay for the salespeople, we always had that ability.

*Id.* at 171:10–12.

> If we had been given the notice and they said[,] "Just go finish the WIP," we wouldn't have needed LGCY. We wouldn't have done that. We would have just finished the WIP. We would have had plenty of money to take care of installers and salespeople. That would have been fine. So we didn't need LGCY to do that.

*Id.* at 171:15–21.

The Court finds that this deposition testimony is insufficient for a reasonable jury to find in Mint's favor on this issue.  Though Spencer was certain that Mint had not been insolvent, he also appears to define insolvency as only whether Mint owed money to

Sam's Club.[5]   And when Scott was asked directly about insolvency, he answered with the caveat, "Not that I'm aware of.  I mean – I didn't do Mint."[6]   (Doc. 81-6, p. 40, depo. 153:13–14).   Mint has not offered any financial statements, analysis, or other specific facts to create a genuine dispute as to whether it was insolvent in April and May 2018. Therefore, the Court finds that Mint was insolvent before June 29, 2018.

Further, the Court concludes that this is a material breach of the agreement. "Under Arkansas law, a breach is material where there is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party." *Walls v. Petrohawk Props., LP*, 812 F.3d 621, 625 (8th Cir. 2015) (internal quotation marks omitted).   Mint's insolvency and its concomitant inability to complete the business transactions contemplated by the Agreement substantially defeat the purpose of the contract for Sam's Club.

---

[5]  Specifically, the exchange was as follows:

Q. What is your definition of "insolvency"?

A. I'm not sure I could give you a correct definition of insolvency, but we did not owe Sam's Club any money.

(Doc. 81-5, p. 26, depo. 96:10–12).

[6] The entire exchange was:

Q. Was there ever a time in 2018 that Mint was insolvent as a company?

A.  No.

[Plaintiff's counsel]: Object to form.

A. No. Not that I am aware of. I mean I didn't – I didn't do Mint.

(Doc. 81-6, p. 40, depo. 153:9–14).

*2. Performance Standards*

Next, Sam's Club alleges that Mint breached the performance standards included in the Agreement by failing to staff the clubs in which it had tables, failing to complete the contracts it entered into with members, and failing to fulfill its financial commitments to members, employees, and installers.  Mint argues that Sam's Club cannot maintain this position because it has not disclosed an expert on the "standard industry practice" in the relevant sector.  The Court concludes that expert testimony is not necessary for the type of breach that Sam's Club alleges, and Mint has not met its burden to put forward specific facts showing a genuine dispute of material fact on this question.

In *Aetna Insurance Co. v. Hellmuth, Obata & Kassabaum, Inc.*, the Eighth Circuit noted that there is a "general rule" requiring "expert testimony to establish the standard of professional care," which is most often applied to physicians and surgeons, but that "the same principle is applicable to attorneys, architects and engineers and other professional men."  392 F.2d 472, 478 (8th Cir. 1968).  The Eighth Circuit specified, however, that this general rule "is necessary when issues are presented that are beyond the ordinary competency of laymen jurors, but is not necessary in passing on commonplace factual situations that the ordinary jury layman can readily grasp and understand."  *Id*.  As an illustration, the Eighth Circuit contrasted the failure to perform work specifically required by a contract or the failure to fix work done incorrectly, on which the "jury is competent to pass . . . without knowledge of the professional skills and competency required," with issues "relating to stress and strain and weightbearing

capacities of structural elements" which are "beyond the ordinary comprehension of most laymen" so that "the court and jury require expert enlightenment."[7]  *Id.*

Here, the Court concludes that the errors alleged by Sam's Club are the kind that fall within the common knowledge of the factfinder and for which no expert testimony is required.  A lay factfinder can understand the significance of facts regarding staffing levels and meeting financial and contractual obligations without explanation by an expert.  Furthermore, the Court finds that there can be no genuine factual dispute that Mint failed to meet the performance standards of the Agreement.  As cited above, the record contains numerous examples of installers, customers, and employees to whom Mint made obligations it failed to fulfill.  On May 24, 2018, Mint was sent a text from its liaison with Sam's Club warning that "customer complaints that have escalated = 60+ and growing." (Doc. 77-14).  While "the common person" may not "know how utility rebates work" or "know and understand the interaction between suppliers, finance companies, and installation companies, or what a work-in-progress pipeline is and why it is significant," (Doc. 101, p. 4), none of those form the basis for the Court's finding that Mint did not

---

[7] Though *Aetna* involves Missouri law, Arkansas courts have long recognized the same principle in the context of legal and medical malpractice.  *See, e.g.*, *Hasse v. Starnes*, 915 S.W.2d 675, 678 (Ark. 1996) ("[E]xpert testimony is not required when the asserted negligence lies within the comprehension of a jury of laymen, such as a surgeon's failure to sterilize his instruments or to remove a sponge from the incision before closing it. On the other hand, when the applicable standard of care is not a matter of common knowledge the jury must have the assistance of expert witnesses in coming to a conclusion upon the issue of negligence.") (citing *Lanier v. Trammell*, 180 S.W.2d 818 (Ark. 1944)); *Barnes v. Everett*, 95 S.W.3d 740, 749 (Ark. 2003) (holding that the "generally accepted standard of practice" for an attorney "requires expert testimony as to what the standard of practice is, unless the trial court determines that such testimony is not necessary because the case falls within the common-knowledge exception").  The Court is confident that Arkansas courts would apply the same principle to standards for other professions.

satisfy the performance standards.  The evidence of Mint's failure to meet its obligations to customers, employees, and installers requires no elucidation by an expert and leaves no dispute as to Mint's inadequate level of performance.

In response, Mint offers Spencer's deposition testimony that the company was executing its business "[b]etter than anybody in the industry."  (Doc. 81-5, p. 39, depo. 147:22).  Spencer goes on to opine that "just showing me some emails where we had customer complaints or problems doesn't change the fact that we were a very good company doing the very best that we could and above industry standards."  *Id*. at p. 40, depo. 151:13–16.  He argues that "Sam's Club has the same type of stuff on all sides: Installers, vendors, customers.  That's normal in a company."  *Id*. at depo. 152:8–10.

The Court concludes that this testimony is insufficient to satisfy Mint's burden to meet proof with proof and that no reasonable juror could conclude based on the evidence presented that Mint's operations in Sam's Clubs complied with the performance standards.  The Court also concludes that this is a material breach for the same reasons discussed above—Mint's lack of professionalism creates conflicts with customers, employees, and installers that prevent the acquisition and completion of commissions, defeating the purpose of the Agreement for Sam's Club.

### 3.  Confidential Information

Finally, Sam's Club alleges that Mint breached the Agreement by permitting confidential information—the names of Sam's Club members—to be diverted by Savage and used for the benefit of a new company he was setting up with executives from Knight West.  Sam's Club points to the motion for emergency injunctive relief filed in Utah state court by Mint and Knight West, which alleges that Savage kept for his new company

customer leads collected at Sam's Clubs.  *See* Doc. 66-15, ¶ 32.  Amanda Love from Sam's Club testified in her deposition that this information was revealed to Sam's Club during the June 22 meeting.  *See* Doc. 66-14, p. 3, depo. 89:7–10.  In response, Mint points to Spencer's deposition testimony that while Mint feared at the time it filed the motion for emergency injunctive relief on June 11, 2018, that Savage and his co-conspirators had diverted leads from Mint, Mint ultimately "couldn't show that they had taken any leads from Sam's Club." (Doc. 81-5, p. 47, depo. 180:9–10).  Furthermore, the state court granted a temporary restraining order enjoining Savage's use of confidential information, including customer contact information.  *See* Doc. 81-11.

For the purposes of Sam's Club's Motion, the question of whether Mint violated the confidentiality provision of the Agreement is only relevant to the extent it would establish a prior material breach that might excuse Sam's Club's further performance under the Agreement.  The Court concludes that a genuine dispute of material fact exists as to whether this breach was material.  At most, Sam's Club has shown that Savage, acting as a Mint executive, collected the names of Sam's Club members for use by his new company.  Sam's Club has not presented evidence that this alleged breach substantially defeats the purpose of the contract, especially in light of Mint's assertion that no leads were actually diverted and the injunctive relief obtained in state court.  Therefore, the Court finds that Sam's Club is not entitled to summary judgment on this point.

### B.  Breach Alone Does Not Release Sam's Club from Notice Requirement

Since the Court has found that Mint was in material breach of the Agreement prior to June 29, 2018, it next turns to the question of whether this material breach relieved Sam's Club of further performance under the Agreement.   Sam's Club argues that

Arkansas courts have long applied the "general rule" that "the failure of one party to perform his contractual obligations releases the other party from his obligations." *Boellner v. Clinical Study Ctrs., LLC*, 378 S.W.3d 745, 753 (Ark. 2011). None of the cases Sam's Club cites in support of this proposition, however, involve a contract containing a notice-and-cure provision, and the Court concludes that the general rule is inapplicable where the parties have agreed to a cure period.

"In interpreting the meaning of a contract, the first rule of construction is to give to the language the meaning that the parties intended." *Asbury Auto. Used Car Ctr. v. Brosh*, 314 S.W.3d 275, 279 (Ark. 2009). An important way to understand intent is to "look[ ] to the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning." *Id*. Here, the Agreement unambiguously provides that a breach of the Agreement is only grounds for termination after written notice of the breach is received and a thirty-day "cure period" has run. To apply the "general rule" in this situation would nullify the parties' contract. *See, e.g.*, *Matrix Grp. Ltd., Inc. v. Rawlings Sporting Goods Co.*, 477 F.3d 583, 589 (8th Cir. 2007) ("[Plaintiff's prior] alleged breach of the contract[ ] . . . is not a defense to [plaintiff's] breach of contract action. It is precisely when a party is not in substantial compliance with the contract that the notice and cure provision mandates the giving of thirty days' notice."); *Alliance Metals, Inc. v. Hinely Indus., Inc.*, 222 F.3d 895, 903 (11th Cir. 2000) ("[A finding that] the company's antecedent breach excused [defendant] from any further performance under the contract . . . would effectively render meaningless contractual 'notice and cure' requirements like the one included [in the contract before the court]."). Thus, the Court

concludes that Mint's prior breaches of the Agreement did not relieve Sam's Club of the obligation to provide notice and an opportunity to cure.

### C. Cure Period is not Required if Opportunity to Cure Would Be Futile

In the alternative, Sam's Club argues that the law does not require strict compliance with a notice-and-cure provision when a breach is incurable. The Court agrees. While courts in Arkansas have not expressly adopted this principle, the Court has carefully reviewed the law from many other jurisdictions and concludes that were the Arkansas state courts presented with this question, they would find that incurability is a valid defense to termination without notice even when a contract contains a notice-and-cure provision. *See Peoria Partners, LLC v. Mill Grp., Inc.*, 2015 WL 8989675, at *7 (N.D. Ill. Dec. 16, 2015) ("[I]n the absence of Illinois case law on the issue, the prevailing approach in other jurisdictions (and at least one leading treatise) is that a non-breaching party need not comply with a contractual notice and cure provision when the material breach is incurable."); *AgTech Sci., LLC v. Blue Circle Dev.*, 2020 WL 1975375, at *3 (E.D. Ky. Apr. 24, 2020) ("In the absence of Kentucky case law on this issue, the Court notes that other jurisdictions typically reach the same conclusion."); *Dix v. Atos IT Solutions & Servs, Inc.*, 2021 WL 1165762, at *8 (S.D. Ohio Mar. 25, 2021) ("Michigan's recognition that certain breaches are 'incurable,' and thus render any notice-and-cure provision inapplicable, is the 'prevailing approach' across the country.").

Sam's Club goes further and asks the Court to decide the question of futility as a matter of law at summary judgment. The Court finds, however, that while Sam's Club will be permitted to assert this defense, the question of incurability cannot be decided as a matter of law on the record before the Court. "[T]he futility of giving notice is an issue of

fact." *Alliance Metals*, 222 F.3d at 905. *See also Southland Metals, Inc. v. Am. Castings, LLC*, 2014 WL 12461376, at *2 (W.D. Ark. July 20, 2014) ("[I]t is for the jury to determine . . . whether such alleged breaches could have been cured or were, by their nature, 'incurable.'").

In cases where the breach is potentially reversible, even if that possibility seems slim, courts have declined to decide the question of futility as a matter of law. In *Alliance Metals*, for example, the defendant was a former employee subject to a noncompete agreement that included a notice-and-cure provision. The defendant breached the noncompete agreement and his former employer sued for breach of contract. The defendant argued that the company had committed prior material breaches that were incurable. The Eleventh Circuit declined to decide the question of futility at summary judgment. As to one alleged breach, the circuit court observed that the breach "appears, on its face, to be reversible and therefore curable." 222 F.3d at 905. As to another alleged breach, the plaintiff's participation in a price-fixing conspiracy, the circuit court rejected the argument that the alleged breach was so significant that "there was no going back." *Id*. Rather, the Eleventh Circuit concluded that "[a]t a minimum, receiving notice would have given [the plaintiff] thirty dates to brace itself for [the defendant's] transition from compatriot to competitor." *Id*. at 906.

Similarly, in *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419 (2d Cir. 2011), the parties agreed to negotiate and agree to specific terms for a branded line of merchandise for which the plaintiff, L-7 Designs, would receive royalties. Ultimately, however, Old Navy informed L-7, whose principal was also Old Navy's creative director, that the parties would not be able to reach an agreement regarding the terms of this branded line. The

plaintiff filed suit alleging breach of contract.  Old Navy then sent a letter indicating that filing the lawsuit was a breach of the contract, and the agreement was therefore terminated.  L-7, in turn, added a claim for wrongful termination of the agreement because Old Navy had not given notice and an opportunity to cure, which was required by the contract.  The district court dismissed the plaintiff's claim for wrongful termination of the contract holding that "notice of cure would have been futile" because "it is highly unlikely that L-7 would have withdrawn the complaint if Old Navy had sent L-7 a notice to cure." *Id*. at 428–29.  The circuit court reversed.  This determination regarding the futility of cure, the circuit court held, "appears to be speculative."  *Id*. at 435.  Therefore, the district court erred in dismissing the claim on a motion for judgment as a matter of law.

In contrast, in *Giuffre Hyundai, Ltd. v. Hyundai Motor America*, 756 F.3d 204 (2d Cir. 2014), the case on which Sam's Club relies, the Second Circuit decided the issue of futility at summary judgment because a cure was actually impossible.  In *Giuffre*, the contract between the parties provided for its immediate termination if the plaintiff was convicted of any violation of law tending "to adversely affect the operation, management, reputation, business or interests of [the defendant], or to impair the good will associated with" the defendant's brand.  *Id*. at 206.  This provision for immediate termination conflicted with a New York state statute requiring written notice and a reasonable time to cure a material breach before termination of a franchise agreement.  In civil proceedings by the attorney general, the plaintiff franchisee was found to have engaged in fraudulent and deceptive business practices, and the defendant franchisor terminated the franchise agreement without notice.  The plaintiff brought suit seeking an injunction to prevent the immediate termination of the franchise agreement in light of the state statute.  The Second

Circuit affirmed the district court's grant of summary judgment to the defendant, holding that state common law "will not require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless, or if the breach undermines the entire contractual relationship such that it cannot be cured." *Id*. at 209. The court held that, as a matter of law, the plaintiff's breach "was not susceptible of cure" because the plaintiff's fraudulent conduct "was an adjudicated fact." *Id*. at 210–11. The judgment in the fraud case had not been appealed, and the time for appeal had passed. Therefore, there was no way for the plaintiff to change the fact that it was in violation of the franchise agreement, and summary judgment for the defendant was appropriate.

In sum, the Court is mindful of the position of the Second and Eleventh Circuits that futility is not to be decided as a matter of law where it requires a court to speculate about what the breaching party might have done if notice of the breach had been provided as required by the contract. Reasonable jurors might disagree whether Mint would have been able to repair its relationships with disgruntled customers, employees, and installers within the bounds of the performance standards or whether the reputational harm was so great to Sam's Club that no subsequent remedial efforts would have repaired the damage. Reasonable jurors might also disagree about the likelihood of Mint's ability to secure financing to cure its insolvency. The Court therefore finds summary judgment on the question of futility is not appropriate.

### D. Damages

Since the Court declines to grant summary judgment as to liability, it proceeds to Sam's Club's arguments regarding damages. Sam's Club seeks summary judgment as to Mint's claims for lost profits, money expended in expectation of expansion, and

attorney's fees.  Sam's Club previously moved to exclude these categories of damages in its motion to dismiss.  At that stage in the litigation, given that it was to rely solely on the pleadings and to make reasonable inferences in Mint's favor, the Court declined to foreclose any category of damages.  The Court now revisits these issues, applies the summary judgment standard, and determines that some of Mint's alleged lost profits are consequential damages that are precluded by the plain language of the Agreement, as are reliance damages expended in anticipation of the Rollout and attorney's fees.

### 1.  Lost Profits

As the Court discussed in its November 22 Opinion, lost profits may be either general or consequential damages.  Where lost profits are "the natural and direct result of the breach" of a contract, courts have held that lost profits are a form of general damages.  *Deck House, Inc. v. Link*, 249 S.W.3d 817, 825 (Ark. Ct. App. 2007).  Consequential damages, in contrast, do "not flow directly and immediately from the act of the party, but only from some of the consequences or results" of the breach.  *Dawson v. Temps Plus, Inc.*, 987 S.W.2d 722, 728 (Ark. 1999).  The Agreement explicitly excludes "special, incidental, or consequential damages of any kind (including but not limited to lost profits . . . )."  (Doc. 66-1, p. 5, ¶ 5.3(A) (emphasis omitted)).

The Court concludes that some lost profits are the natural and direct result of Sam's Club's alleged breach of the Agreement.  The Agreement between the parties permitted Mint to sell its products in clubs, and when Sam's Club expelled Mint from the clubs on June 29, 2018 without notice or an opportunity to cure, the obvious consequence was that Mint would not be able to continue the sales it had been making up to that point.

Lost profits associated with the existing level of sales were the natural and direct result of the alleged breach and are recoverable for the rest of the original term of the Agreement.[8]

Another consequence of Sam's Club's alleged breach of the Agreement was the lost opportunity for Mint to expand its presence in Sam's Clubs pursuant to the Rollout. Additional profits might have flowed from Mint's expansion, but the loss of those profits results from a consequence of the breach—the lost opportunity to expand—and not directly from the breach itself.  Lost profits from the anticipated expansion are therefore consequential damages.  Consequential damages are expressly foreclosed by the terms of the Agreement, and Mint will not be permitted to seek such damages from the jury.

### 2. Reliance Damages

Sam's Club also argues that, as a matter of law, Mint cannot seek damages for expenditures made in preparation for the Rollout into additional Sam's Club stores.  Mint asserts that the Court's November 22 Opinion already ruled on this issue.  However, Mint misunderstands the significance of the Court's prior Opinion.  While the Court rejected Sam's Club's argument that the Rollout was not a "representation . . . contained in writing and signed by an officer of Sam's Club," as required by the first sentence of Section 9.17, the Court did not opine on the significance of the second sentence, which provides that "any expenditures, investments, or commitments made by Mint in reliance on any present or future business from Sam's Club pursuant to this Agreement are done at Mint's own risk and without any obligation whatsoever from Sam's Club."  (Doc. 66-1, p. 13, ¶ 9.17).

---

[8] The original one-year term of the Agreement would have expired on September 27, 2018.  As explained below in Section IV, Sam's Club provided valid notice pursuant to Section 1.3(C) of the Agreement to terminate the contract at that time.

Neither party argues that the language is ambiguous, offers parole evidence, or makes any other argument regarding the interpretation of this second sentence.   The Court finds that the language is not ambiguous and holds that under the plain meaning of Section 9.17, Mint may not recover in damages expenditures it made in anticipation of expanding its presence in Sam's Clubs.

### 3.  Attorney's Fees

Finally, Sam's Club argues that the plain meaning of Section 5.2 of the Agreement expressly forecloses attorney's fees and costs.   Mint argues that the Court's November 22 Opinion already resolved this question, but again, Mint misunderstands the significance of the Court's Opinion.   Rather, the Court declined to offer a definitive interpretation of this provision since "principles of contract interpretation under Arkansas state law permit the Court to consider the 'actual intent and conduct of the parties' in addition to 'viewing the subject of the contract[ ] as the mass of mankind would view it.'" (Doc. 24, p. 8 (quoting *Singletary v. Singletary*, 431 S.W.3d 234, 240 (Ark. 2013)).   The parties have since engaged in discovery, and neither party takes the position that the language is ambiguous or offers additional evidence as to the parties' intent and understanding.   While the provision is not a model of clarity, the Court concludes that the plain language of the Agreement precludes a prevailing party from recovery attorney's fees and costs.

### IV.  MINT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Mint seeks summary judgment on the issue of Sam's Club's liability, arguing that it is undisputed that Sam's Club breached the Agreement by failing to provide adequate notice before terminating its contract with Mint.   For the reasons already discussed above,

the Court will not grant summary judgment on the question of Sam's Club's liability for failing to provide notice and an opportunity to cure pursuant to Section 1.3(B).  Though Sam's Club does not claim to have given Mint the required notice-and-cure period, the Court finds that Mint committed prior material breaches of the Agreement and Sam's Club is entitled to present as a defense the incurability of Mint's breaches.  As the Court discusses above, it does not find as a matter of law that it would have been futile for Mint to try and cure its breaches.  However, it also cannot conclude that the breaches were necessarily curable.  The Court disagrees with Mint's characterization that courts only apply the futility defense when the party who would cure has repudiated or abandoned the contract.  The fact that courts have recognized the defense in the context of abandonment or repudiation, like the case Mint cites, *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003 (2d Cir. 1991), does not mean that is the only context in which the defense is applicable, as the Court has discussed at length above. Finally, the Court notes that Sam's Club's efforts to cure Mint's breach do not necessarily establish that Mint itself, given its financial situation, would have been able to do the same.

As to the inadequacy of Sam's Club's notice pursuant to Section 1.3(C), the Court is unpersuaded by Mint's arguments.  This section permitted termination of the Agreement upon "written notice of termination within 30 days' [sic] prior to the end of the Term."  Mint argues that giving this provision its plain meaning creates an absurd result— it permits the terminating party to give notice mere hours or minutes before the end of the contract term.  Instead, Mint asks that the Court treat "within" as meaning "at least."  While the plain language of Section 1.3(C) may not be what Mint would like or even good business practice, that does not make it absurd.  "When contracting parties express their

intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed." *Tri-Eagle Enters. v. Regions Bank*, 373 S.W.3d 399, 403 (Ark. Ct. App. 2010).  Therefore, the Court will not give Section 1.3(C) an interpretation other than its plain meaning and declines to find as a matter of law that Sam's Club did not comply with the notice requirements of Section 1.3(C).

Mint also seeks summary judgment as to Sam's Club's counterclaim.  Mint argues that Sam's Club was only damaged because it unreasonably prevented Mint from completing the work it had in progress in June 2018 and even paid for work to be done without collecting payment from the members for whom the work was funded.  Whether it was appropriate for Sam's Club to intervene to complete the work in progress and pay members the incentives Mint owed them will depend on whether the jury concludes that Mint's prior breach was incurable.  And the question of whether Sam's Club could have mitigated its damages is not one on which Mint has presented sufficient evidence to warrant summary judgment.  This will be a determination for the jury.  For these reasons, the Court will not grant summary judgment on Sam's Club's counterclaim.

### V. CONCLUSION

For these reasons, **IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 60) is **DENIED** and Defendant's Motion for Summary Judgment (Doc. 63) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED** on this 30th day of April, 2021.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE